# UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF TEXAS
# SAN ANTONIO DIVISION

| | |
|---|---|
| MARGARITA GOMEZ, § | |
| § | |
| *Plaintiff*, § | |
| § | |
| v. § | Civil Action No.  SA-18-CV-1101-XR |
| § | |
| OFFICE ALLY, INC. and BRIAN § | |
| O'NEILL, § | |
| § | |
| *Defendants*. § | |

## ORDER ON MOTION FOR SUMMARY JUDGMENT

On this date, the Court considered Defendants' Motion for Summary Judgment (docket no. 18), Plaintiff's response (docket no. 22), and Defendants' reply (docket no. 23). After careful consideration, the Court GRANTS summary judgment.

## BACKGROUND

This case relates to Plaintiff Margarita Gomez's leave under the Family and Medical Leave Act ("FMLA") and her termination as Human Resources Manager of Defendant Office Ally, Inc., of which Defendant Brian O'Neill is owner and CEO. Gomez, in her Original Petition filed on September 14, 2018, brings claims for disability discrimination and retaliation under the Texas Commission on Human Rights Act ("TCHRA") and for interference and retaliation under the FMLA. Docket no. 1-1. On October 18, Defendants removed to this Court. Docket no. 1.

Office Ally hired Gomez as HR manager of its San Antonio office in August 2014. Gomez Dep., 42:7-12. O'Neill, who lives in Nevada, visits the San Antonio office rarely. O'Neill Dep., 22:19-20. In 2016, Gomez told O'Neill that she planned to move her mother, who has

1

dementia, from El Paso to San Antonio, so that Gomez could provide her care. *Id.* at 13:7-14:4. O'Neill objected to this plan because it would be expensive for Gomez and because he assumed it would affect her work schedule. *Id.*

After Gomez's mother moved in, Gomez sometimes called or messaged O'Neill to advise him that she needed to take her mother to appointments or otherwise miss portions of work days to care for her mother. *Id.* at 20:16-21:7. O'Neill states he did not reprimand Gomez because he understood she was making up her missed time. *Id.* In November 2017, O'Neill states he received complaints from Carolyn Bond, the new San Antonio site manager, and other employees that Gomez was often absent or tardy. *Id.* at 26:19-27:8. O'Neill states that "she needed to notify me if she's going to be coming in late" because "that was what our deal was." *Id.* at 88:8-15. O'Neill states he also received complaints from other employees and managers, including COO Gloria Chung, that Gomez's work performance was declining. *Id.* at 37:8-22.

On February 7, 2018, O'Neill gave Gomez a Performance Improvement Plan ("PIP"). Docket no. 18-3. The PIP identifies five gaps in performance related to updating the employee handbook, which had not been updated since 2015; providing mangers with current interviewing and hiring guidelines; ensuring all offices have up-to-date posters on the relevant laws of that state; improving the work relationship between the Washington and San Antonio offices; and ensuring all new hires are verified. *Id*. O'Neill states he was prompted to issue the PIP because the complaints about Gomez meant "we had to deal with this now. Possibly losing a contract, a big contract, that's a big deal." O'Neill Dep., 42:5-8. As O'Neill acknowledges, he did not memorialize the alleged complaints against Gomez in the PIP, mention that a contract was threatened, and did not note dissatisfaction as to Gomez's work attendance. *Id.* at 45.

On February 12, Gomez arrived late to work without informing O'Neill. Gomez Dep. 108:7-12. She told O'Neill she was late because she was caring for her mother, and O'Neill suggested she take FMLA leave. *Id.* at 117:24-118:4. O'Neill states he suggested this because

> her performance was going down, bad. And so if your job performance is going down—the reason for FMLA is to go and take care of your situation at home, either set up some form of "we can get this squared away so that we can get mom cared for, either in a nursing home or move some people in" or whatever, to care for the situation so it's no longer a problem, so it doesn't affect your job performance. Her job performance was going down fast.

O'Neill Dep., 57:10-24.

O'Neill states that Gomez's job performance began to slip after Gomez's mother moved in. *Id.* at 58:14. O'Neill states that Gomez's attitude changed three months before he issued the PIP; he did not memorialize these observations, though he states "I should have written her up many times over." *Id.* at 60, 63.

Gomez states she had reservations about taking FMLA leave because, she states, O'Neill disapproved of those employees who took FMLA leave. Gomez Dep., 34-37. O'Neill, on the other hand, states "[t]he only thing I frown upon is when . . . we have people who know how to work the system. They get two write-ups, and then they file FMLA, intermittent FMLA, so that no longer can they be written up for not showing up on time. And then they're protected. . . . That, I frown on. But FMLA, absolutely not." O'Neill Dep., 70. The employees who "game the system," O'Neill states, are "about to go out, and then they file their FMLA claim. We heard nothing about their sick child before that." *Id.* at 71. O'Neill states he had a suspicion that Gomez was similarly gaming the system. *Id.* at 72.

Also on February 12, O'Neill went to lunch with Ahmed Mahmoud, an IT specialist, whose declaration states he heard O'Neill say: "[Gomez] isn't pulling her weight and just isn't

3

doing her job;" "These problems all started when she moved her mother in;" and "[Gomez] moved her mother into her house so she could get her money and get paid by the government." Docket no. 22-4.

On February 16, Gomez informed O'Neill of a situation with her mother and that she would look into her "options under FMLA." O'Neill Dep., 81. On February 17, at a charity event, Mahmoud states that O'Neill told him Gomez quit her job. Docket no. 22-4. Mahmoud states that, when he tried to verify whether Gomez's computer and authorizations had changed, he noticed that her access to the server, email systems, and voicemail had been disabled, which he states was unusual, as he would normally be contacted to disable remote electronic access. *Id.*

On February 18, Gomez requested FMLA paperwork. She was on approved FMLA leave from February 19 until May 16, when she returned to work.

On March 15, while Gomez was on leave, Chung emailed Gomez and requested that she send her company laptop back to Office Ally. O'Neill Dep., 113. Gomez replied that she would "ship it out the earliest I can." Docket no. 18-1 at 104. Chung then told O'Neill that it "[d]oesn't look like she plans to return it" and "my guess is that she wants to keep it so she has a computer to use for personal reasons." *Id.* at 103. Chung stated that "based on her response I think she's counting on us coming back and asking for it sooner so that she can say we were overly pressuring/harassing her or something along those lines." *Id.* O'Neill states he felt he needed to "protect himself" by getting the laptop back. O'Neill Dep., 111.

During her leave, Office Ally retained Xenium, an external human resources company, to perform human resources functions in Gomez's absence. When Gomez returned, Xenium had provided Office Ally a proposal for permanent services, which Office Ally was considering. On

4

May 16, the date Gomez returned, she learned that Xenium would perform many HR functions, Campbell would be responsible for FMLA functions, and Carla Duran would be responsible for Xenium relationships. Without her former responsibilities, Gomez was tasked, upon returning, with preparing a proposal "for how she envisions her role going forward with Xenium." Docket no. 18-1 at 108.

Also on May 16, O'Neill states he was approached by Mary Pieczkiewicz, who told O'Neill that she had heard Gomez was returning. O'Neill Dep., 147:10-148:15; Pieczkiewicz Decl. She told O'Neill of a time when Gomez answered her office phone on speaker, even with other people in the room. *Id.* O'Neill states that the call Gomez received was about an employee issue, and after hanging up Gomez called the employee a "stupid little girl." O'Neill Dep., 148. Pieczkiewicz notified O'Neill that other managers also heard these conversations and had similar complaints. *Id.* O'Neill reached out to these managers, and in declarations provided by Defendants, managers Valerie Allen, Christopher Ruiz, and Carolyn Bond report hearing comments from Gomez, including: Gomez referring to the Washington office as "us against them," Gomez telling Ruiz he did not want to be one of "those people who rely on a therapist for everything," and Gomez telling Bond that two managers had "white privilege" and that O'Neill was gay. Gomez denies most of these accusations and claims the managers invented these statements to win favor with O'Neill. Docket no. 18 at 7.

O'Neill testifies that these managers were prompted to come forward—despite the fact that their complaints stemmed from before Gomez's leave—because they learned she was returning to work. O'Neill Dep., 149. He states that he "would have terminated her immediately" had he known of these complaints. *Id.* "She would have never made it to FMLA. If I knew these

things when these managers, that—she wouldn't have been here. We wouldn't be here today." *Id.* He testifies that he did not learn of these complaints because, given "the relationship [Gomez] and I had, they were afraid" to report. *Id.* at 149-150. These employees' complaints are documented in detail in emails sent when O'Neill began to investigate Gomez's conduct. Docket no. 22-2 at 113-18.

Also on May 16, Gomez requested a "flex schedule," which Chung denied, after which Gomez requested a schedule running from 7:45 a.m. to 4:45 p.m. Docket no. 22-2 at 106. Gomez was upset that her flex schedule request was denied because other employees were granted flex schedules. *Id.* at 110.

On May 23, O'Neill offered a separation agreement, which Gomez declined. O'Neill them prepared a termination memo in which he stated that "Office Ally decided to eliminate [Gomez's] position and to retain Xenium XR for all human resource needs. Office Ally will refer to the termination as a 'position elimination to outsource HR.'" Docket no. 22-2 at 121.

## DISCUSSION

On June 7, 2019, Defendants moved for summary judgment on all of Gomez's claims. Docket no. 18.

### I. Summary Judgment Standard

A party is entitled to summary judgment only if it demonstrates that there is no genuine dispute of material fact and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). In order to demonstrate that there is no genuine issue of material fact, a movant either has to negate the existence of a material element of the non-movant's claim or defense or point out that the evidence in the record is insufficient when the non-movant bears the burden of proof for

that element at trial. *Lavespere v. Niagra Machine & Tool Works, Inc.*, 910 F.2d 167, 178 (5th Cir. 1990). To satisfy its initial responsibility, a movant without the burden of proof at trial need only point out that there is an absence of evidence to support the non-movant's claim to shift the burden to the non-movant to show that summary judgment is not proper. *See Fields v. City of S. Hous.*, 922 F.2d 1183, 1187 (5th Cir. 1991).

There is a genuine issue of material fact when the evidence allows a reasonable jury to return a verdict for the non-movant. *Rogers v. Bromac Title Servs., L.L.C.*, 755 F.3d 347, 350 (5th Cir. 2014) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). In order to conclude that no genuine issue of material fact exists, the court must be satisfied that no reasonable trier of fact could have found for the non-movant. *See Anderson*, 477 U.S. at 250 n.4. A court on summary judgment must review the summary judgment record taken as a whole, but the court is not permitted to make "credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150–51 (2000). The court must review "all facts and inferences in the light most favorable to the nonmoving party." *Dillon v. Rogers*, 596 F.3d 260, 266 (5th Cir. 2010).

## II. Application

The Court will first consider Gomez's FMLA claims.

### a. Gomez's FMLA claims fail.

The FMLA allows eligible employees "to take reasonable leave for medical reasons, for the birth or adoption of a child, and for the care of a child, spouse, or parent who has a serious health condition." *Elsensohn v. St. Tammany Parish Sheriff's Office*, 530 F.3d 368, 372 (5th Cir. 2008) (citing 29 U.S.C. § 2601(b)(2)). When the employee returns to work, the employer must

reinstate the employee "to the same position as previously held or a comparable position with equivalent pay, benefits, and working conditions." *Smith v. E. Baton Rouge Parish Sch. Bd.*, 453 F.3d 650, 651 (5th Cir. 2006) (citing 29 U.S.C. § 2614(a)(1)).

An employer may not "interfere with, restrain, or deny the exercise of or the attempt to exercise" any right provided under the FMLA, 29 U.S.C. § 2615(a)(1), nor can an employer "discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter," *id.* § 2615(a)(2). These provisions create two types of claims, both of which Gomez asserts here: "(1) interference claims, in which an employee asserts that his employer denied or otherwise interfered with his substantive rights under the Act, and (2) retaliation claims, in which an employee asserts that this employer discriminated against him because he engaged in activity protected by the Act." *Kendall v. Walgreen Co.*, 2014 WL 1513960, at *4 (W.D. Tex. Apr. 16, 2014).

If Gomez makes out a prima facie case for either claim, the burden shifts to her employer to articulate a legitimate non-discriminatory reason for the employment action at issue. *Caldwell v. KHOU-TV*, 850 F.3d 237, 245 (5th Cir. 2017) (citing *Miller v. Metrocare Servs.*, 809 F.3d 827, 832 (5th Cir. 2016). If the employer does so, the burden shifts back to Gomez, who must raise an issue of material fact that the employer's proffered reason was pretextual. *Id.*

The above framework, derived from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, (1973), is not always used in FMLA retaliation cases. Instead, the mixed-motive framework applies to cases in which discrimination was a motivating factor in, but not the sole reason for, the discharge. *Richardson v. Monitronics Int'l, Inc.*, 434 F.3d 327, 333 (5th Cir. 2005).

> Within the mixed-motive framework, (1) the employee must make a prima facie case of discrimination; (2) the employer must articulate a legitimate, non-

8

discriminatory reason for the adverse employment action; and (3) the employee must offer sufficient evidence to create a genuine issue of fact either that (a) the employer's proffered reason is a pretext for discrimination, or—and herein lies the modifying distinction—(b) that the employer's reason, although true, is but one of the reasons for its conduct, another of which was discrimination. If the employee proves that discrimination was a motivating factor in the employment decision, the burden again shifts to the employer, this time to prove that it would have taken the same action despite the discriminatory animus. The employer's final burden is effectively that of proving an affirmative defense.

*Id.* (internal quotations omitted).

### i. Defendants are entitled to summary judgment on Gomez's interference claim.

To establish a prima facie claim for interference under the FMLA, Gomez must show: (1) she was an eligible employee; (2) her employer was subject to FMLA requirements; (3) she was entitled to leave; (4) she gave proper notice of her intention to take FMLA leave; and (5) her employer denied her the benefits to which she was entitled under the FMLA. *Caldwell*, 850 F.3d 245 (5th Cir. 2017) (citing *Lanier v. Univ. of Tex. Sw. Med. Ctr.*, 527 Fed. Appx. 312, 316 (5th Cir. 2013)). Unlike a retaliation claim, an interference claim does not require proof of discriminatory intent—the plaintiff must prove only an act of interference. *See Cuellar v. Keppel Amfels, LLC*, 731 F.3d 342, 350 (5th Cir. 2013).

Defendants do not appear to dispute any of the first four elements of Gomez's prima facie interference case. This claim turns, then, on whether Office Ally denied her an FMLA benefit. The only interfering act discussed in Gomez's response is Office Ally's—and particularly O'Neill's—alleged hostility to FMLA leave. Conduct that discourages or chills employees from exercising FMLA rights can be the requisite interfering act. *See Harbuck v. Briggs Equip.*, 2006 WL 2168096, at *5 (S.D. Tex. July 31, 2006) (collecting cases); *Terwilliger v. Howard Mem'l*

9

*Hosp.*, 770 F. Supp. 2d 980, 983 (W.D. Ark. 2011) (noting that "an interference claim includes the 'chill theory'").

Here, O'Neill himself testified that he is sometimes skeptical of employees "gaming the system" in abusing the FMLA process, and he testified that he was skeptical in Gomez's case specifically. Gomez testified that, in her capacity as HR manager who worked closely with O'Neill, she believed he frowned on FMLA leave. Gomez also points to Mahmoud's statement that O'Neill spread a rumor that Gomez quit and to the saga involving return of Gomez's laptop. All told, Gomez argues these actions "would chill a person of ordinary firmness from taking FMLA leave for fear of being treated as a malingering former employee who allegedly quit, to avoid being branded as a thief of company property, and to avoid being labeled an opportunistic and litigious person looking to manufacture a legal claim." Docket no. 22 at 18.

As Defendants point out, however, the Fifth Circuit has not used the "ordinary firmness" test Gomez advances. Instead, the Fifth Circuit has indicated that for FMLA interference claims based on discouragement to be actionable, the plaintiff must not take leave or must take less leave because of the discouragement. *See Eaton-Stephens v. Grapevine Colleyville Indep. Sch. Dist.*, 715 F. App'x 351, 357 (5th Cir. 2017) (affirming dismissal where the plaintiff testified that her employer discouraged her from taking FMLA leave and that her co-workers harassed her for taking leave "but [did] not testify that she took less leave because of these actions"); *De La Garza-Crooks v. AT&T*, 252 F.3d 436 (5th Cir. 2001) ("Assuming that discouragement from use of FMLA leave is sufficient to state an FMLA injury, appellant has failed to present any evidence that she refrained from taking FMLA leave to which she was entitled because of actions by

10

AT&T. To the contrary, the record suggests that appellant took all FMLA leave available to her during the period relevant to this case.").

An Eighth Circuit case that used the "ordinary firmness" language of Gomez also aligns with the Fifth Circuit's holding in *Eaton-Stephens*. *See Pulczinski v. Trinity Structural Towers, Inc.*, 691 F.3d 996, 1007 (8th Cir. 2012) ([Plaintiff] argues that he need not show that [his employer's] actions actually deterred him from taking leave, so long as an employee of ordinary firmness would have been discouraged. This is not a correct statement of the law of this circuit. [Plaintiff] must show that the employer denied him entitlements under the FMLA.").

Here, it is undisputed that Gomez took FMLA leave; it does not matter that another employee might be deterred from taking leave in this situation. Thus, Gomez does not make out a prime facie interference claim. The Court grants summary judgment in favor of Defendants on this claim.

### ii. Defendants are entitled to summary judgment on Gomez's retaliation claim.

Nest, the Court turns to Gomez's retaliation claim. To establish a prima facie claim for retaliation, Gomez must show (1) she engaged in a protected activity; (2) her employer discharged her; and (3) there is a causal link between the protected activity and the discharge. *Miedema v. Facility Concession Servs., Inc.*, 487 F. App'x 214, 218 (5th Cir. 2012). The "causal link" prong is "established when the evidence demonstrates that the employer's decision to terminate was based in part on knowledge of the employee's protected activity." *Medina v. Ramsey Steel Co.*, 238 F.3d 674, 684 (5th Cir. 2001). When evaluating whether there is a causal connection, courts consider the temporal proximity between the FMLA leave and the termination. *Mauder v. Metro. Transit Auth. of Harris Cnty., Tex.*, 446 F.3d 574, 583 (5th Cir. 2006). To establish the causal link,

11

temporal proximity, if offered by itself, must be "very close." *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273-74 (2001) (per curiam).

### a. Prima facie case

Here, only the "causal link" element is challenged. Gomez has established a prima facie case for retaliation, as she was fired seven days after returning from FMLA leave.

### b. Legitimate, non-discriminatory reason

The burden, then, shifts to Office Ally to show a legitimate, non-discriminatory reason for Gomez's discharge. The evidence shows a history of complaints against Gomez. By O'Neill's account, one manager approached him with a complaint, and when he sought information from other managers, they too brought complaints about Gomez's behavior. One manager advised O'Neill that he might find responses critical of Gomez in the (then-discontinued) anonymous survey results, and he did. All of these complaints pre-date Gomez's FMLA leave, as does her PIP.

These documented concerns about Gomez's performance and professionalism, coupled with Office Ally's recognition that an external company provided HR services capably, form a non-discriminatory reason for her discharge. "This burden is one of production, not persuasion; it 'can involve no credibility assessment.'" *Allain v. Bd. of Supervisors of Univ. of Louisiana Sys.*, 81 F. Supp. 3d 502, 511 (W.D. La. 2015) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993)). Defendants meet their burden.

### c. Pretext or, alternatively, mixed motive

With the burden shifted back to Gomez, she argues Office Ally's non-discriminatory reasons are pretextual and, alternatively, Office Ally had mixed motives. Gomez must show, by a

preponderance of the evidence, that either (a) the articulated reasons were pretext for retaliatory animus (the traditional *McDonnell–Douglas* pretext alternative) or (b) that, while [the employer's] articulated reasons may be true, they are but one explanation for its conduct, another of which was discriminatory animus (mixed-motive alternative)." *Allain*, 81 F. Supp. 3d at 512.

### i. Pretext

Gomez does not meet her burden to show pretext. The most Gomez can muster is O'Neill's testimony that he was suspicious that Gomez was an employee he suspected of gaming the FMLA system, the communications regarding Gomez's laptop in which Chung and O'Neill assumed she was trying to bait them into a harassment claim, the timing and manner in which O'Neill began his investigation of Gomez's behavior, and O'Neill's admission that the real reasons for Gomez's firing were not those set out in her termination memo. Even viewed in the light most favorable to Gomez, the Court concludes that no rational factfinder could find that the reasons for Gomez's firing were pretextual.

### ii. Mixed-motive

Alternatively, although Gomez does not concede that discrimination was not the sole reason for her discharge, the mixed-motive framework remains available to her. *See Smith v. Xerox Corp.*, 602 F.3d 320 (5th Cir. 2010). Given the evidence above, the Court concludes a rational factfinder could find Gomez's exercise of FMLA rights was "at least a motivating factor" in the decision to fire her. *See Allain*, 81 F. Supp. 3d at 512.

Under the mixed-motive framework, the burden once more shifts to Defendants to show Gomez would have been fired with or without their discriminatory motive. Defendants do not give any evidence apart from that relied on in showing a non-discriminatory reason. "Reliance on

13

the same evidence under both steps may be adequate; however, the final step requires the employer to meet a more stringent burden of persuasion and show that it would have taken the same action regardless of the retaliatory motive." *Ion v. Chevron USA, Inc.*, 731 F.3d 379, 392 (5th Cir. 2013) (citing *Mooney v. Aramco Servs. Co.*, 54 F.3d 1207, 1217 (5th Cir. 1995)).

However, this evidence is enough to show that Gomez would have been fired irrespective of any discriminatory motive. The record shows that Pieczkiewicz, prompted by the news that Gomez was returning, decided finally to report her concerns "because I was concerned that, on her return, she would reintroduce the toxic office atmosphere that had existed before she left." Pieczkiewicz Decl. Pieczkiewicz named other managers that had similar complaints. *Id.*

Learning for the first time of the string of incidents set out in the emails sent contemporaneous to O'Neill's investigation (and re-stated in the employee declarations), O'Neill investigated and concluded "there was too much evidence here" and he "was done." O'Neill Dep., 161:9-15, 168:7-14. It was Gomez's FMLA leave that precipitated the airing of long-held grievances, but those grievances offer ample evidence on which Defendants can show they would have fired Gomez irrespective of any discriminatory motivation. Gomez, in refuting these complaints, guesses that these managers fabricated the complaints or had ulterior motives, but she can only speculate. But "[m]anagement does not have to make proper decisions, only non-discriminatory ones." *Bryant v. Compass Grp. USA Inc.*, 413 F.3d 471, 477-78 (5th Cir. 2005).

Defendants easily show that Gomez would have been fired; no rational factfinder could conclude otherwise. Thus, Defendants are granted summary judgment on Gomez's FMLA retaliation claim.

### b. Gomez's TCHRA claims fail as a matter of law.

Gomez brings claims under the Texas Commission on Human Rights Act for failure to accommodate her mother's disability, associational discrimination based on Gomez's association with her disabled mother, and retaliation.

First, Gomez's claim for failure to accommodate her mother's disability fails because, under the TCHRA, employers are not obliged to do so. The statute states: "It is an unlawful employment practice for a respondent . . . to fail or refuse to make a reasonable workplace accommodation to a known physical or mental limitation of an otherwise qualified individual with a disability who is an employee or applicant for employment . . . ." TEX. LAB. CODE § 21.128(a). Thus, under the plain language, the TCHRA does not require an employer to accommodate the disability of an employee's relative, and Gomez's claim to that effect fails.

Second, Gomez's associational discrimination claim fails because the TCHRA, unlike the Americans with Disabilities Act, does not allow for associational claims. As stated in *Spinks v. Trugreen Landcare, L.L.C.*, 322 F. Supp. 2d 784, 795 (S.D. Tex. 2004),

> The TCHRA contains no provision that violations can be based on association with individuals with a disability or with individuals who are regarded as having a disability.
> 
> In contrast, the ADA includes a provision that specifically prohibits discrimination by "excluding or otherwise denying equal jobs or benefits to a qualified individual because of the known disability of an individual with whom the qualified individual is known to have a relationship or association". See 42 U.S.C. 12112(b)(4). The plain language of the TCHRA, as opposed to the plain language of the ADA, indicates that the Texas legislators did not intend to include the provision for association with and individual with a disability, since the drafters could have included such language if they had wanted.

Thus, this claim fails as a matter of law.

...
...

Finally, Gomez's TCHRA retaliation claim fails for the same reasons her FMLA retaliation claim fails.

## CONCLUSION

Accordingly, Defendants' Motion for Summary Judgement (docket no. 18) is GRANTED.

The Clerk shall enter Judgment pursuant to Rule 58 that Plaintiff shall take nothing by her claims and that her claims are dismissed with prejudice. The Clerk is directed to close this case.

Defendant may file a bill of costs pursuant to the Local Rules.

It is so ORDERED.

SIGNED this 1st day of July, 2019.

_____

XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE

Finally, Gomez's TCHRA retaliation claim fails for the same reasons her FMLA retaliation claim fails.

## CONCLUSION

Accordingly, Defendants' Motion for Summary Judgement (docket no. 18) is GRANTED.

The Clerk shall enter Judgment pursuant to Rule 58 that Plaintiff shall take nothing by her claims and that her claims are dismissed with prejudice. The Clerk is directed to close this case.

Defendant may file a bill of costs pursuant to the Local Rules.

It is so ORDERED.

SIGNED this 1st day of July, 2019.

_____

XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE